**R O B E R T   M A R I N E L L I**
**A T T O R N E Y   A T   L A W**
**3 0 5   B R O A D W A Y ,   S U I T E   1 0 0 1**
**N E W   Y O R K ,   N E W   Y O R K   1 0 0 0 7**
**( 2 1 2 )   8 2 2 - 1 4 2 7**
**F a c s i m i l e   ( 2 1 2 )   2 0 2 - 9 6 4 6**

July 22, 2016

<u>**BY ECF**</u>

Honorable Vera M. Scanlon
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

  Re: *Alleyne et al. v. City of New York, et al.*, 15 CV 1860 (WFK)(VMS)

Your Honor:

  I represent plaintiffs Kashif Alleyne and Damani Macfarlane. On October 30, 2014, search warrants were executed at Plaintiffs' respective apartments in 1346 Park Place Boulevard ("1346") in Brooklyn.[1] Defendants alleged that during the search they found each Plaintiff in possession of a small amount of marijuana. Plaintiffs now request that the Court issue an order compelling Defendants to produce certain information concerning the use of a Confidential Informant ("CI") whose alleged controlled purchases led to the issuance of the warrant, as well as information relating to the underlying police investigation that went into the warrant application and affidavit. Plaintiffs and Defendants have fully conferred on these issues.

I. <u>Factual Support For And Procedural History Of The Instant Application</u>

  On February 22, 2016, Plaintiffs made a similar application to this Court. <u>See</u> Docket 18. At that time, Your Honor ordered Plaintiffs to make this request in State Court and invited Plaintiffs to renew their application if they were unsuccessful. On April 21, 2016, the State Court denied Plaintiffs' application, stating that Your Honor could order whatever relief it deemed appropriate for the purpose of this litigation, and that Plaintiffs should renew their request in Federal Court. <u>See</u> Exhibit A.[2]

  Significant new information has just come to light requiring Plaintiffs to renew this motion. As detailed in Plaintiff June 30 letter motion (Exhibit B) plaintiffs only now learn of Rahman's contemporaneous role in the investigation, warrant execution and simultaneous arrests at 1333 Park Place Boulevard ("1333"). Moreover, Plaintiffs were previously unaware that Rahman's standard pattern and practice to operate well outside NYPD guidelines in terms of recording CI operations and exchanging money with CI's.

  As a result, Plaintiffs renew their application for CI-related information before Your

---

[1] These buildings are across the street from each other.

[2] For purposes of brevity, I refer Your Honor to the background information provided in Plaintiffs' motion dated June 30, 2016. <u>See</u> Exhibit B

Honor as the State Court directed them to do in the event they wished to pursue that material.[3]

II.    In Light Of The Newly Discovered Evidence Described In Section I, Plaintiffs Move To Compel Defendants To Produce Six Categories Of Documents

At this juncture, Plaintiffs are not seeking the identity of the CI, only records concerning the CI's use. Accordingly the informer's privilege in inapplicable. *Roviaro v. United States, 353 U.S. 53, 59-60 (1957)*. Additionally, as neither Plaintiff was the target of any warrant nor accused of selling marijuana, the dates and times of the purported sales, particularly almost three years after the incident, will not expose the CI to danger.

Plaintiffs ask that Defendants be compelled to produce the following categories of records.

- Memo book entries, DD5s, Field Tests, or any other documents that reflect any member of the NYPD's Investigation, Search Warrant Application and Search Warrant execution in this matter, for both 1333 and 1346 ("CI and SW records"). These records include, but are not limited to, Rahman's recordkeeping on unofficial pieces of paper.
- The CI's information from NYPD's confidential informant database. This database has quarterly reviews, evaluations ratings by the CI's designated contact and supervisor on a quarterly basis ("CI profile records").
- The "Rap" sheet of the CI ("CI RAP Sheet records").
- Any documentation reflecting any contact between the CI and Rahman, or any other member of the NYPD regarding this incident ("CI/Rahman records").
- The identity of the Supervisor(s) working with Rahman and the CI and records relating to his/her supervision of Rahman's and other NYPD members' work with the CI here ("CI/Supervisor records").
- Documentation concerning any Pre-recorded Buy Money ("PRBM") and/or payments to the CI for his/her services;

III.    The Requested Production is Relevant and Warranted

A.    Rahman's Record Keeping in connection with his CI Work Demonstrates the Need for Additional Discovery

As an initial matter, Rahman's general record keeping practices with respect to CIs is so fundamentally flawed as to call his general credibility into question, not to mention his specific representations about what a CI said to him about Plaintiffs to justify search or about what was found on Plaintiffs to justify arrest. Rahman testified that when he met with a CI, he often took notes in a personal notebook, on the back of an envelope or on any other piece of paper available. Other times he dispensed with any written notes, relying instead strictly on his memory. Rahman then either put the notes in his desk, in a file with reports, or just threw them away.  See Exhibit C at 21:6-25:2; 47:15-52:23; 131:5-132:22; 136:17-137:11. Rahman did not consider these "notes" to be official documents and did not make effort to retain them in any

<hr>

[3]Plaintiffs apologize that these requests are coming late in the litigation. However, the Parties should have no difficulty meeting the current August 30, 2016 discovery deadline if they move expeditiously.

organized manner, much less provide them to prosecutors.[4] Id. at 21:6-25:2; 47:15-52:23; 92:5-99:13. When questioned about the instant matter in particular, Rahman did not recall if he had taken any notes when speaking with this particular CI in connection with 1333 or 1346, but in any event, any record of any event, including contact with the CI and any identification procedure is memorialized in a police report called a "DD5." Id. at 21:6-25:2;131:5-132:22; 136:17-137:11.

The requested records will help Plaintiffs determine if Rahman's testimony about operating far outside the NYPD's standard practices was truthful, in which case the parties can proceed with an understanding that Rahman has failed to create, or has destroyed or failed to preserve critical records of his dealings with the CI Alternatively, if a set of standard NYPD records relating to Rahman's dealings with the CI and the investigation suddenly materialize, that indicates that Rahman deposition testimony was designed to throw Plaintiffs' off the scent of such records. In either event, the requested discovery is relevant both as to the facts in dispute and his credibility.

B.    Payments to CIs

Rahman testified that he paid CIs only if they made a "successful buy," id. at 14:16-15:7; 108:15-108:25; 247:17-249:6; 255:20-258:16; 280:20-281:11, and that it would impact his decision to use a CI if they were unable to complete successful buys, id. at 14:16-15:7. Finally, he stated that he had used the CI in this case more than 40 times. Id. at 56:9-57:7. Accordingly, this CI had a strong motivation to come back with a successful buy report each and every time (otherwise the CI would go home with empty pockets). Plaintiffs believe that they are entitled to the CI profile records and the CI RAP Sheet records because such strong monetary motivation plus a robust CI RAP Sheet plus suspiciously constant successful buy reports would indicate great CI unreliability.  Furthermore, Plaintiffs believe that the lab records (or a summary report of these) relating to his or her career-wide reports of successful buys would show whether the CI was bringing back material that was testing positive as contraband at all.  Id. at 108:15-108:25.

C.    Rahman's Records of PRBM and Monies Paid to the CI

Rahman testified that CIs are provided PRBM[5] prior to the execution of a "controlled buy." Rahman is not certain whether copies were made of the money used; although a supervisor may have made copies. Id. at 111:7-114:12. In any event, no copies of buy money in this matter are in the police file or anyplace else.  Id. at 112-114.  Any information that might exist is present in either Rahman's memo book or a DD5. Id. at 113. Thus Plaintiffs seek production of the PRBM records and the CI/Rahman Supervisor records.  These records, or the lack thereof, will illuminate Rahmen's method of working with his CI and will provide documentation that these purported controlled buys occurred.

Concerning payments to the CI for their services, Rahman testified that a supervisor would be "reimbursed" for money used as payment; although later in his testimony, Rahman provided a different response. Id. at 251:5-255:19.   Production of Rahman/CI records and

---

[4] A practice violating the "Rosario" discovery Rule as codified in N.Y. CPL § 240.45.

[5] PRBM is cash given by a police officer to a CI to use when making a controlled buy of contraband.

CI/Rahman Supervisor records will allow Plaintiffs to test whether reimbursement happened, how regularly, and what amounts were reimbursed.

If Rahman was paying the CI money as a <u>quid pro quo</u> only for "successful buys", that is one problem, but if Rahman failed to document how much money he was giving for what he wanted, this creates an even greater concern. The fact that Rahman covered his tracks to prevent us from learning this shows that something truly untoward might have been happening as he oversaw the simultaneous 1333 and 1346 investigations, which coincidentally yielded a high number of arrests that did not result in conviction.

    E.    <u>Rahman's Shifting Testimony Regarding His Participation in the Raid at 1333</u>

As discussed in Section I, Plaintiffs have only just now learned about the simultaneous investigations of 1333 and 1346[6] and the poor recordkeeping that makes it reasonable to think that observations at one location were confused with operations at another. It is for this reason that Plaintiffs need the 1333 records. Rahman's testimony shows a muddle between the investigations, searches, and the foundation for the eventual arrests. Now that Plaintiffs' record establishes that, Plaintiffs should have an opportunity to compare and contrast the 1333 and 1346 documents to see if any sense can be made of them. Plaintiffs have always alleged that Defendants' investigation into and claimed discovery of contraband at 1346 was corrupted by poor recording. This late-stage revelation that that corruption was caused by the 1333 investigation corroborates Plaintiffs previously argued theory and Plaintiffs request an opportunity to further develop the fruit of their strategic discovery requests, interrogatories and deposition questions.

Yours truly,

/ss/

Robert Marinelli

---

[6] At the commencement of Rahman's deposition, Plaintiffs were unaware that he participated in the search warrant execution at 1333. To conceal his participation, Rahman initially testified that he did not remember if he went directly to the entrance of 1346, Rahman upon arriving at the scene. <u>Id.</u> at 192:5-195:25. However, after Your Honor granted Plaintiffs permission to question Rahman concerning the search at 1333, Rahman remembered that after exiting his car, he was a full participant in the raid at 1333 prior to approaching 1346. <u>Id.</u> at 262:5-268:4; 273:8-275:18.